UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

KATRINA RICE

CASE NO. 8:20-cr-4-T-02JSS
18 U.S.C. § 371

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy - 18 U.S.C. § 371)

#### A. Introduction

At all times material to this Information:

1. A Contract for Purchase and Sale was a written contract used in the sale of real property. The Contract for Purchase and Sale set forth the details of the real estate transaction including a description of the property to be sold, the seller of the property, the buyer of the property, the purchase price, and other conditions of the sale. As part of the sales process, the Contract for Purchase and Sale had to be executed by both the buyer and seller of the property.



2. A short sale referred to the sale of real estate property for an amount less than the balance owed on the mortgage loan for the property. Under certain circumstances, a financial institution would sometimes approve and participate in a short sale transaction and receive less than the full amount owed to the institution on an outstanding mortgage, such as when a borrower was not able to pay the mortgage loan on the borrower's property and the property was worth less than the balance owed on the mortgage.

3. A Short Sale Affidavit was a form required by a financial institution considering approving a short sale where the parties to a short sale transaction promise the bank that the parties do not know each other and that there is no pre-existing relationship between the seller and the buyer. The parties to the short sale transaction generally made the following certifications, amongst others, in a short sale affidavit subject to civil and/or criminal liability:

    a. No party to the short sale contract is a family member, business associate, or a person who shares a business interest with the seller;

    b. There are no hidden terms or special agreements relating to the current or subsequent sale of the property among buyers, sellers, and/or agents;

    c. All amounts to be paid to any person or entity, including holders of other liens on the property in connections with the short sale have been disclosed, approved and will be reflected on the HUD-1 Settlement Statement; and

  d. None of the parties will receive any compensation except for the commission paid to the agents.

The information provided and certified by the parties in the short-sale affidavit influenced a financial institution's decision to agree to a short sale.

4. A sale of real property was finalized at a settlement conference, commonly known as a "closing," and usually presided over by a closing agent. Typically, the closing agent worked for a title agency that was responsible for preparing closing documents, conducting real estate closings, and receiving and disbursing mortgage loan proceeds in accordance with the United States Department of Housing and Urban Development Settlement Statement ("HUD-1 Settlement Statement").

5. A HUD-1 Settlement Statement was a form universally used in the closing process. A HUD-1 Settlement Statement was used to identify and allocate the various receipts, disbursements, expenses, and payments associated with the sale of residential real property between the buyer and the seller of the property. In addition, buyers and sellers were required to provide truthful information on the HUD-1. The information provided in the HUD-1 influenced a financial institution's decision to agree to a short sale

6. Line 303 of the HUD-1 Settlement Statement indicated whether a buyer was bringing his/her cash-to-close as down payment funds.

7. The HUD-1 Settlement Statement also frequently included the following certification or similar statement by the prospective borrower and seller:

> I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

8. Some financial institutions and mortgage lenders had rules limiting or restricting "property flips," that is, when a buyer purchased a home and quickly resold it for a profit. To prevent such flips, many lenders specified that they would not approve a mortgage if the seller had purchased the home within a specified time-period, such as ninety days.

9. The Federal Housing Administration ("FHA") also had rules, which prevented it from insuring mortgages if the seller of a home had purchased the home within ninety days of the sale.

10. Financial institutions and mortgage lenders required applicants for short sales to provide truthful information, including, in some cases, information that the home had been marketed for a period of time, and that the buyer had the necessary down payment or "cash-to-close" funds to purchase a property.

11. Ditech Financial, Everhome Mortgage, Inc., ("Everhome Mortgage"), and Nationstar Mortgage, LLC ("Nationstar Mortgage") were financial institutions as defined by the Fraud Enforcement and Recovery Act of 2009, that is, organizations that financed and refinanced debt secured by an interest in real estate and with activities that affected interstate and foreign commerce.

12. Defendant KATRINA RICE was a licensed real estate sales associate who worked for Real Estate Company 1 and was a resident of the Middle District of Florida.

13. Title Company 1 was a title company located in Tampa, Florida, that conducted real estate closings for properties. Co-conspirator Linda Cagwin was a licensed title agent who worked for Title Company 1 where she conducted real estate closings.

14. Acquisition Company 1, Acquisition Company 2, and Acquisition Company 3 were companies that purchased real property in the Middle District of Florida.

15. Real Estate Investor 1 was a real estate investor and a resident of the Middle District of Florida.

16. Co-conspirators Thomas Kepler and Marianne Keim were residents of the Middle District of Florida.

### B. The Conspiracy

17. Beginning on an unknown date, but no later than in or around January 2014, and continuing through in or around October 2017, in the Middle District of Florida and elsewhere, the defendant,

KATRINA RICE,

did knowingly and willfully combine, conspire, confederate, and agree with others, including Cagwin, Keim, and Kepler, and others who are known to the United States Attorney, to knowingly make and submit, and caused to be made and submitted, false statements and reports for the purpose of influencing in any way the actions of financial institutions, in violation of 18 U.S.C. § 1014.

### C. Manner and Means of the Conspiracy

18. The manner and means by which the conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

    a. It was part of the conspiracy that co-conspirator Keim would and did identify properties in the Middle District of Florida with mortgages that were in default proceedings and facing foreclosure;

    b. It was further part of the conspiracy that co-conspirator Keim would and did tell homeowners whose properties were in default

proceedings that she could stop the foreclosure sale, there was a pre-arranged buyer for the property, and the homeowners could receive payments for participating in a short sale of their home;

  c. It was further part of the conspiracy that, after identifying a subject property, Keim would and did structure two interrelated transactions in a "short sale flip" of the subject property, which generally took place as follows:

    i. <u>The A-B Transaction</u>: The A-B Transaction consisted of the sale of property by the original owner (the "A-Owner") to a buyer (the "B-Buyer"). In the A-B Transaction, the conspirators and others represented to the financial institution holding and/or servicing the mortgage on the subject property that the B-Buyer was willing to pay a specific price for the subject property, which was less than the full amount owed on the mortgage.

    ii. <u>The B-C Transaction</u>: In the B-C Transaction, the conspirators pre-arranged to quickly sell, or "flip," the subject property from the B-Buyer to a third participant (the "C-Buyer") who had surreptitiously funded the original purchase in the A-B Transaction. The B-C Transaction purchase typically closed for significantly more than the A-B Transaction.

  d. It was further part of the conspiracy that Keim would and did recruit real estate investors into purchasing properties from Kepler and other B-Buyers prior to a financial institution approving the A-B Transaction;

e. It was further part of the conspiracy that Keim would and did direct those real estate investors to send funds to Title Company 1 to be used by Kepler to purchase properties in the A-B Transaction just prior to of the A-B Transaction closings;

f. It was a further part of the conspiracy that, on occasion, Keim would and did direct other participating conspirators to kickback to her and others a portion of the conspiracy proceeds after the B-C Transactions had closed;

g. It was a further part of the conspiracy that RICE would and did act as the real estate agent of record for the A-B Transaction;

h. It was a further part of the conspiracy that defendant RICE would and did pay or cause to be paid kickbacks to Keim from RICE's real estate commissions that were not disclosed on the HUD-1 Settlement Statements for certain A-B Transactions;

i. It was a further part of the conspiracy that, on occasion, RICE would and did negotiate the short sale terms and conditions for the A-B Transactions with the victim financial institutions;

j. It was a further part of the conspiracy that defendant RICE and other conspirators would and did sign and submit, and caused to be signed and submitted, false Short Sale Affidavits to financial institutions, that

falsely stated:

    i. That there are no hidden terms or special agreements relating to the current or subsequent sale or the property among buyers, sellers/agents; and

    ii. All amounts to be paid to any person or entity in connection with the short sale have been disclosed, approved, and will be reflected on the HUD-1 Settlement Statement.

    k. It was further part of the conspiracy that co-conspirator Cagwin and other conspirators would and did prepare, sign, and submit, and caused to be prepared, signed, and submitted, false HUD-1 Settlement Statements to financial institutions that did not represent a true and accurate account of the A-B Transactions. Specifically, the HUD-1 Settlement Statements concealed and misrepresented the true source of the cash-to-close funds used by the B-Buyer, Kepler, to purchase the A-B Transaction properties. The HUD-1 Settlement Statements also concealed that funds were kicked back to conspirators outside of closing.

    l. It was further part of the conspiracy that the conspirators would and did work to influence the actions of financial institutions in approving proposed short sale transactions through the use of false Short Sale Affidavits and false HUD-1 Settlement Statements.

    m. It was a further part of the conspiracy that the conspirators would and did share and/or distribute conspiracy proceeds.

n.  It was further a part of the conspiracy that RICE and other co-conspirators would and did engage in multiple meetings, perform acts, and make statements to promote and achieve the object of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof, including the preparation and use of false and misleading HUD-1 Settlement Statements, Short Sale Affidavits, and other related real estate transaction documents.

### D.  Overt Acts

19.  In furtherance of the conspiracy and to achieve the object and purpose thereof, defendant RICE and other co-conspirators committed, and caused to be committed, in the Middle District of Florida and elsewhere, at least one of the following overt acts, among others:

20.  <u>1xx1 Dedham Road, Sun City, Florida</u>

a.  In or around summer 2014, co-conspirator Keim approached distressed homeowner J.G. (the "A-Owner"), whose home was in foreclosure, and told J.G. that she dabbled in real estate, would assist with selling his house, had a buyer for the home, and would flip it.

b.  On or about September 5, 2014, prior to the A-B Transaction, RICE prepared and executed a Contract for Purchase and Sale for the 1xx1 Dedham Road, Sun City, Florida, property which was signed by

homeowner J.G. and the C-Buyer.

    c.    On or about September 15, 2014, prior to the A-B Transaction, RICE sent an e-mail to co-conspirator Cagwin containing the executed real estate sales contract for the B-C Transaction.

    d.    On or about September 22, 2014, prior to the A-B Transaction, co-conspirator Keim paid seller J.G. $2,000.

    e.    On or about September 23, 2014:

        i.    Co-conspirator Cagwin conducted a short sale real estate closing at Title Company 1 between J.G. and co-conspirator Kepler for 1xx1 Dedham Road, Sun City, FL (the "A–B Transaction").

        ii.    A $80,341.09 official bank check remitted by the C-Buyer was deposited into Title Company 1's escrow account which was used, in part, to fund Kepler's purchase of 1xx1 Dedham Road, Sun City, FL.

        iii.    Co-conspirator Cagwin conducted a subsequent real estate closing (the B-C Transaction flip sale) at Title Company 1 between Kepler (the "B-Owner") and the C-Buyer for approximately $80,000.

        iv.    RICE and her co-conspirators signed, or caused to be signed, under criminal penalty a Short Sale Affidavit submitted to a financial institution, that is, Nationstar Mortgage.

        v.    RICE and her co-conspirators signed, or caused to be signed, under criminal penalty a HUD-1 Settlement Statement submitted to a financial institution, that is, Nationstar Mortgage.

    f. On or about September 25, 2014, co-conspirator Cagwin caused an approximately $500 commission check, drawn on Title Company 1's escrow account, to be issued to co-conspirator Keim, which was not disclosed on the A-B transaction HUD-1 Settlement Statement submitted to Nationstar Mortgage for the 1xx1 Dedham Road short sale.

    g. On or about December 15, 2015, co-conspirator Cagwin caused an approximately $2,501.80 check, drawn on Title Company 1's escrow account, to be issued to co-conspirator Keim.

  All in violation of 18 U.S.C. § 371.

## **FORFEITURE**

  1. The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(2).

  2. From her engagement in the violation alleged in Count One of this Information, punishable by imprisonment for more than one year, the defendant,

        KATRINA RICE,

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(2), any property constituting or derived from proceeds obtained directly or indirectly as a result of said violation.

3. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of proceeds obtained as a result of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

MARIA CHAPA LOPEZ
United States Attorney

By: _____
Christopher Poor
Assistant United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section